IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

| | | |
|---|---|---|
| **Plaintiff B**, **Plaintiff J**, **Plaintiff S**, and **Plaintiff V**, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No.  5:08cv79-RS-AK** |
| **JOSEPH R. FRANCIS, MRA HOLDINGS, LLC,** **MANTRA FILMS INC.**, and **AERO FALCONS, LLC,** | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR A NEW TRIAL AND/OR TO ALTER OR AMEND THE JUDGMENT**

In support of Plaintiffs' motion for a new trial pursuant to Federal Rule of Civil

Procedure 59(a) and/or to alter or amend the judgment against them pursuant to Federal Rule of

Civil Procedure 59(e) regarding their claims against Joseph R. Francis ("Francis"), Plaintiffs

state:

**PRELIMINARY STATEMENT**

The judgment entered in favor of Francis is fatally flawed, requiring a new trial.  Many

factors made it impossible for this jury to render a reasoned verdict:  Francis' disruptive

behavior; the *de facto* admission of unauthenticated medical records; and a closing geared to

stigmatize these plaintiffs, eliciting the "slut" stereotype that painted these girls as "other," a

category of persons so fundamentally damaged that they could not be damaged further.  This

made it impossible for the jury to ignore the issue of *consent* as this Court directed the jury to do

and as the law requires.  In this stereotype, the "slut" has already consented, she cannot *not*

consent, and a pornographer simply reveals her "true" nature, no matter how young she is; 17, 16, 15, or 13. As counsel argued to the jury in closing, "[t]hese aren't innocent girls who aren't somewhat familiar with what goes on on spring break … It is a moral cesspool at spring break in Panama City Beach … And these girls knew exactly what went on at spring break. And their parents knew what went on at spring break." Exh. 1, April 5, 2011 T.Tr. at 16.[1]

Counsel's use of the "slut" stereotype explains the internal inconsistency in the verdict. The jury found that Francis engaged in "behavior that goes beyond all decency and is regarded as shocking, atrocious, and utterly intolerable in a civilized community" when he filmed and featured these minors in his pornographic production, but somehow found that "shocking, atrocious, and utterly intolerable" behavior caused these girls *no* damage. The jury found that Francis engaged in this pattern of criminal activity by exploiting Plaintiffs B and V, but again, found a pattern of criminal exploitation caused them *no* damage. No matter what Francis did to these girls, once they were painted as "sluts," Francis could not damage them.

On a motion for a new trial, the judge determines if the verdict is against the great weight of the evidence or will result in the miscarriage of justice. Once the stereotypes are put to one side, when the actual evidence on the record is considered, the great weight of the evidence does not support this verdict. This verdict is a miscarriage of justice; it finds that a pornographer can exploit teenage girls without damaging them, which declares "open season" on teenage girls and invites their sexual exploitation by adult men. This record requires this Court to grant Plaintiffs a new trial.

---

[1]   Certain of the trial transcripts ("T.Tr.") received from the court reporter lacked pagination. Plaintiffs have inserted pagination where it was otherwise absent.

DM1\2626709.2

## FACTS

### A.      Francis and the Corporations Repeatedly Disobey Court Orders

During pretrial phase, Francis continued to use the obstreperous tactics he employed during discovery.  First, the Corporations were defaulted for violating five Court orders requiring that they obtain counsel by a date certain.  Dkt. 559.  No Defendant complied with any of the Court's pretrial orders.  Defendants had no witness list and no documents they could use at trial. Francis did not show up to the pretrial conference, violating yet another set of Court orders. Although it could have, the Court did not default Francis.

On the first day of trial, Francis finally came to the courthouse—two and one-half hours late.  Francis had retained counsel to represent him just for that day.  This attorney was the sixth attorney who appeared in the case.  The entire first day of trial was wasted while Francis decided if he wanted to pay this counsel; Francis eventually decided not to pay counsel, and proceeded *pro se*.

An additional pretrial was then required.  There were multiple problems created by Francis proceeding *pro se*; he was not aware or did not care to respect any of the pretrial rulings of the Court.  When Francis told this Court that he planned to cross-examine Plaintiffs by asking them irrelevant questions that violated Federal Rule of Evidence 412, another conference became necessary.  To stress the seriousness of its ruling, this Court ruled that anyone who violated Rule 412 would be immediately taken into custody.

### B.      *Pro Se* Francis Makes A Mockery Of The Trial

Since Francis refused to hire counsel, the trial began with Francis representing himself, assisted by a former reporter who identified himself as Francis' "handler," and trailed by a cameraman for a reality show about the trial.  Francis immediately starting delivering unsworn testimony to the potential jury during *voir dire*.  Francis interrupted Plaintiffs' counsel several

times during *voir dire*, shouting out from counsel table claiming that he was not able to hear, snorting, and distracting counsel, the potential jurors, and the Court.

When it was Francis' turn to question the jury, Francis lied about proceeding *pro se*, claiming that his attorney's father had died and therefore could not attend, but Francis did not want to waste the community's time so he was proceeding *pro se*; he began to tell the jury that he could not afford an attorney (this continued until his seventh counsel appeared).  He repeatedly told the jury that this was the first trial that he had ever done, that he was defending himself, and that he was struggling to do his best.

During his opening statement, while Francis was receiving multiple reprimands from the Court for making inappropriate comments, he continued to try and garner sympathy from the jury, saying that he could not afford counsel, that his counsel's father died, *etc*.  As this Court well knows, Francis is a multimillionaire who certainly has the means to retain counsel, and several attorneys were willing to represent Francis.  All of these comments were calculated to invoke the jury's sympathy.  Although Plaintiffs' counsel objected and the Court instructed Francis to behave, Francis' antics continued.

Francis continued to testify—although never under oath—until he left the courtroom. Most egregiously, during the side bars Francis refused to lower his voice.  Everything said during the side bars was heard by the jury and everyone in the courtroom.  On more than one occasion, people seated in the back of the courtroom informed counsel and the Court that they heard every word of the sidebars.  During one of the side bars while Plaintiff B was testifying, Francis shouted that Plaintiffs B is a porn star.  Francis shouted repeatedly during side bars that the Plaintiffs lied about their age (and the films would show it!), they had signed releases,  and that they showed fake identification.  Francis also loudly complained (for everyone to hear) that

the Court was unfair to him. Francis loudly disputed facts that were established under collateral estoppel by his criminal pleas; he shouted that Plaintiff B was not identified in the criminal pleas, and that the other Plaintiffs had nothing to do with the criminal pleas. No matter how many warnings Francis received, or how many times he was given a final warning by this Court, Francis chose not to keep his voice down.

At a certain point, Francis took out what he said was a copy of the false identification that he claimed the Plaintiffs had provided and waived it around the courtroom with the jury present. It could not have been actual evidence of false identification; these Plaintiffs had no false identification; no false identification was produced to the Plaintiffs during discovery; and the FBI never found any in their investigation. Francis had told the Court he had some false identification, the Court ordered Francis to produce it, and said it would have a hearing on its admissibility. Instead of following the Court's orders and producing this so-called fake I.D., Francis waived what he said was a copy of some fake identification around the Courtroom in front of the jury. Plaintiffs' counsel was never given whatever Francis waived around the courtroom—Francis did not try to put this manufactured "false identification" into evidence or produce it to the Court for a hearing. The damage had already been done—he was able to show the jury what he claimed was fake identification without having to prove it.

While he was not testifying at the side bar, Francis was distracting the jury. While Plaintiffs' witnesses testified, Francis made comments, faces, loudly ripped up paper, and did everything that he could possibly think of to distract the jury. He made speeches during his objections (ignoring numerous instructions from the Court to state only the grounds), resulting in side bars where he continued to testify. During his cross-examination of Plaintiffs' witnesses, he made comments that certain testimony was not true, made faces, and behaved in a manner utterly

inappropriate for any forum, let alone a federal court. Plaintiffs' counsel was forced to constantly object throughout his cross-examination, and frequently move to strike his comments, which served to further distract the jury, waste time, and make the testimony disjointed.

While Francis showed no respect for this Court, the Court bent over backwards to try and accommodate Francis as a *pro se* defendant. Francis was given chance after chance to behave. Although Francis had no good excuse for not having a qualified attorney present to represent him, this Court never required that Francis know the rules of evidence or proceed like an attorney. The only requirement was that Francis act like an adult—which at 38 years old, he should be expected to do. On more than one occasion, for the whole courtroom to hear, Francis loudly begged the Court for mercy during side bars, crying and shouting that he suffers from ADHD, to garner additional sympathy from the jury. Ironically, while Francis was telling the jury it should hold the 13, 15, 16, and 17 year old children personally responsible for being victimized by an adult man (Francis) and his sophisticated Corporations, as a 38 year old man, he expected this Court to understand his weaknesses and treat him accordingly.

### C. Francis And The Corporations Found Guilty Of Acts Plaintiffs Allege.

While Francis was trying his best to make a mockery of the trial, Plaintiffs put on their case. Plaintiffs began by reading Francis and the Corporations' federal criminal pleas and the deferred prosecution agreement ("the Pleas") to the jury. *See* Plaintiffs' Trial Exhs. 1-2 and 5. Francis' pleas established that he was involved in all major decisions on behalf of the company for the 2002-2003 period; that when Plaintiff B was filmed, the cameraman was acting on his behalf (and that of the Corporations); that the footage of Plaintiff B was included in two titles; that Francis was involved personally in selecting the footage for these titles; and that he knowingly decided to include footage of Plaintiff B when he did not have any records to show that she was over 18. Plaintiffs' Trial Exh. 1, pp. 5-7, para. 9 (a)-(e).

DM1\2626709.2

Mantra's plea established that during 2002 and part of 2003, Mantra did not verify the age of the people in the GGW series; it was the practice of Mantra during that time not to create and maintain records that could determine the age of the girls in the series. Plaintiffs' Trial Exh. 2, p. 12, ¶ 3. The deferred prosecution agreement for MRA incorporated these same admissions. Plaintiffs' Trial Exh. 5, p. 13. All the Pleas attached a list of approximately 175 titles, for which all of these Defendants admitted they did not have any records to demonstrate that anyone in any of the films was actually over age 18. Plaintiffs' Trial Exh., 1 pp. 19-20; Plaintiffs' Trial Exh. 2, pp. 15-16. One of these titles featured Plaintiffs J and S at 13 and 15 years old. Plaintiffs' Trial Exh. 1, pp. 19-20; Plaintiffs' Trial Exh. 2, pp. 15-16. The criminal pleas also contained a $2.1 million fine that Francis and the Corporations paid during the federal criminal proceedings.

For Plaintiff V, Francis was convicted in state criminal proceeding for procuring her, as a minor, into prostitution, when he coerced her to masturbate him. Plaintiffs submitted this into evidence in the form of a statement that was published to the jury. Plaintiffs' Trial Exh. 109.

**D.      The Plaintiffs, Their Mothers, And A Friend Explain How GGW Destroyed Their Lives**

Plaintiffs testified extensively as to how their lives fell apart after GGW featured them in its series, how their communities branded them as "sluts" and "whores," and how they were cast out of their communities. Plaintiff B testified about how she dropped out of college and began a downward spiral, resulting in a nervous breakdown and three different hospitalizations after the film in which GGW placed her was released; her mother and her former boyfriend corroborated her testimony.

Plaintiffs J and S testified that when their community discovered they were featured in the GGW series at 13 and 15, they were branded as "sluts" and "whores," all their friends refused to associate with them, and their breasts and butts were grabbed daily as they walked

7

through the halls of their high school; Plaintiff J and S dropped out of school; Plaintiff J testified

to her suicide attempts; Plaintiff S to her downward spiral ending in a very abusive relationship.

Plaintiff J and S' mother corroborated their testimony.

Plaintiff V testified to being forced to masturbate Francis, for which he was criminally

convicted, and that she was coerced into flashing for the GGW series. She testified that it caused

her boyfriend to break up with her, and played a pivotal role in her subsequent suicide attempt.

She testified that her mother's death and her abusive father made her vulnerable to being taken

advantage of as a 16 year old by Francis.

### E.     Francis Retains Counsel

Francis' foray into the legal profession ended after the cross-examination of Plaintiff V,

when this Court held Francis in contempt for violating its orders. Francis began his cross-

examination of Plaintiff V by telling the court (and of course the jury) that Plaintiffs' counsel

was telling Plaintiff V what to say (which was not true). Francis' cross-examination of Plaintiff

V ended with Francis deliberately violating Rule 412 when he asked her if she is a prostitute.

This Court was very clear in its ruling that anyone in violation of Rule 412 would be taken into

custody—the Court did not take Francis into custody as it could have under its previous order,

but gave Francis another chance, only assessing a monetary fine of $2,500. After days of

prejudicing the jury by telling them repeatedly that he could not afford to retain counsel, that he

had never done this before, and he was doing his best under the circumstances, within a matter of

hours, Francis was able to find funds to pay his contempt fine *and* two attorneys who were ready

to jump in and represent him.

With the appearance of Francis' counsel, the trial started to move along in a more orderly

fashion. However, at this point, Francis' antics in combination with his failure to identify

witnesses or documents to defend himself had set the stage for what was to come.

**F.      As Adolescents, Plaintiffs Were Vulnerable**

Dr. Costanzo, an expert in adolescence, testified about adolescence in general.  He testified as to the development of the adolescent brain, explaining to the jury that a certain portion of the brain, the cerebral cortex, is not fully developed until a person's early to middle twenties.  It is that portion of the brain that allows a person to understand and appreciate the consequences of her acts.  He explained that because of this, adolescents are at a very vulnerable stage of their lives, where they are susceptible to peer pressure and to coercion.  He explained that adolescents are very present focused, meaning they live in the moment and do not consider the consequences of their acts.  Dr. Costanzo testified that the reason that our society has laws that protect minors is because we recognize that they are biologically vulnerable and we as a society seek to protect them from making choices that they will later regret.

**G.      GGW Psychologically Harmed The Plaintiffs**

Dr. Lebowitz testified that all of the Plaintiffs were harmed by GGW.  GGW began a downward spiral that radically destabilized each as follows:  Plaintiff B had a nervous breakdown that ended with three hospitalizations; Plaintiff J attempted suicide twice and entered an abusive relationship; Plaintiff S entered a very violent relationship; and Plaintiff V attempted suicide.  Exh. 2, April 1, 2011 T.Tr. at 17, 56-57, 65, 84-85.  Dr. Lebowitz testified that to come to her conclusion she used a peer reviewed method which consisted of extensive clinical interviews of Plaintiffs and a relative when available.  *Id.* at 7-8.  Dr. Lebowitz also relied on a test given to the Plaintiffs by defense expert, who was not present at the trial, that demonstrated the Plaintiffs were not liars, and were not "gold diggers" or had a profile of people that were just suing for money.  *Id.* at 10-11.

On cross-examination, Francis' counsel made the cornerstone of Francis' defense causation—the argument, that being featured in GGW as minors did not cause their damage.

With no expert witness of his own to put on the stand, Francis' counsel tried to get the opinions of other medical professionals into evidence through Dr. Lebowitz.  Under the guise of trying to challenge Dr. Lebowitz, Francis' counsel put into the record, sometimes by literally reading the medical records, the conclusions of other medical professionals.  Exh. 2 at 96-99, 101-110 (Plaintiff B); *id.* at 112-116 (Plaintiff V); *id.* at 117-122, 125-127, 129, 132-33 (Plaintiff J), *id.* at 143 (Plaintiff S).

Counsel began her cross-examination telling the jury, "[t]hen let's talk about what you did not mention to the jury when you reviewed their medical documentation."  Exh. 2 at 96.  Counsel recited the diagnoses of other medical professionals into evidence under the guise of cross-examination, *id.* at 96, and went so far as to ask Dr. Lebowitz if she had conferred with the medical professionals that treated the plaintiffs, as if the conclusions of these other medical professionals were properly in evidence and could serve as a counterpoint to Dr. Lebowitz's opinion.  *Id.* at 107.

What was *not* in the medical records was just as important for Francis' counsel.  Counsel questioned Dr. Lebowitz extensively about the fact that GGW did not appear in these medical records.  Exh. 2 at 103 ("Q. [S]he was speaking with numerous licensed professionals, I'm sure, doctors, and perhaps not of your caliber, but certainly licensed medical professionals capable of making these sorts of determinations. And anywhere in those doctors' notes did she indicate anything about Girls Gone Wild, or any sort of trauma related to Girls Gone Wild or Joe Francis?" . . . A.  No, I agree with you. People don't talk about what they're ashamed of.  Q. Right. Not until they're suing someone."); *id.* at 113 ("She didn't mention anything there about this incident with Girls Gone Wild either?"); *id.* at 119 ("And in that particular case, while she was under the care of her doctors, she didn't mention anything about Girls Gone Wild, did

she?"); *id.* at 135 ("I'm assuming that you don't find it unusual that none of these women indicated to the medical personnel and the psychiatrist and the doctors that evaluated them prior to this lawsuit that they never disclosed anything about Girls Gone Wild or the issues they had faced because of it?"); *id.* at 144 ("But miraculously, at the time it was time for you to meet with them, someone they never met, they all disclosed the trauma that they had faced with Girls Gone Wild?").

Plaintiffs objected repeatedly to these tactics on grounds that Francis' counsel was getting the conclusions of other medical professionals who were not present in the courtroom, and whose opinions had not been validated or authenticated before the jury on cross-examination. Exh. 2 at 122-124, 130-132, 141-143. Plaintiffs' objections were systematically overruled. *Id.* Defense counsel's questioning of why GGW was not present in the medical records, and what it meant that Dr. Lebowitz did not interview other treating physicians, reached such a level that the Court itself called defense counsel to the bench and told her if she continued, the Court would have to give an instruction that it was not common practice for a retained expert to interview treating physicians. *Id.* at 147-148. Plaintiffs asked for such an instruction, but were denied. *Id.*

On redirect, Dr. Lebowitz explained that it was routine for people who are ashamed of something—like a victim of rape, incest, *etc.* – not to disclose this to a medical professional. Exh. 2 at 155. She testified that many people do not respond "yes" to a direct question about sexual assault because it is shameful; if a medical professional wants to discover it, it has to be asked indirectly. *Id.* at 156-157. Since being sexually exploited by child pornography is a new kind of harm, she doubted that any of the medical professionals that saw the Plaintiffs asked them the questions that could solicit this information. *Id.* at 156.

11

**H.    GGW's "Shoot First Ask Questions Later" Policy**

A number of cameramen testified as to the practices of GGW.  The cameramen testified that it was GGW's practice to "shoot first ask questions later," meaning that they would all film girls first, and then ask about their age after they had the footage (if they asked at all).  They testified that Francis pressured them to pressure the girls to engage in sexually explicit conduct so that they could get scenes; they were paid a bonus of up to $500 for this sexually explicit material.

Cameraman James Daley testified that he was fired because he did not get enough sexually explicit material, and because he would not push the girls when they said that they did not want to participate.  Cameraman Noah Tannenbaum testified that because he was worried about if it was legal to film an underage girl, he asked Francis, and was told that it was fine to film underage girls.  Mark Schmitz, who filmed Plaintiff B and her minor friend, testified that the underage girls who were filmed but not used in the production often landed in Francis' personal collection—and that Francis' ideal girl is an underage teenage girl.  All cameramen testified that Francis was focused above all else on getting footage of scenes—girls engaging in sexually explicit conduct.

**I.    Two Of Francis' Former Counsel Forced To Resign For Ethical Reasons**

Two former counsel for Francis and the Corporations testified that they resigned from representing Francis and the Corporations for ethical concerns.  Attorney Ron Guttman testified that the law required that Francis and the Corporations retain copies of the identification for all of the girls filmed in sexually explicit conduct on file.  He took an inventory of the GGW series, and then quit.  Attorney Michael Burke testified that he also quit representing Francis because of ethical concerns.

**J.      $2.1 Million Dollar Fine For Selling Child Pornography Was Not Significant To Francis**

Via video deposition, Francis testified that he could not remember how much he had been fined for selling pornographic images of underage girls. He testified it was not significant enough for him to be able to remember.

**K.      Francis and His Corporations Generated Almost $160 Million Selling Minors**

Plaintiffs demonstrated to the jury that Francis and the Corporations generated over $17 million (Plaintiffs' Trial Exh. 107) in revenue selling the four titles that featured Plaintiffs B, S, and J. Plaintiffs demonstrated that GGW generated a total of almost $160 million in revenue selling the titles that featured other minors, that GGW was required by the federal government to take out of circulation. Plaintiffs also demonstrated to the jury that the titles that featured Plaintiffs B, S, and J are still being sold on the secondary market, on popular internet sites.

**L.      Defendants' Case**

With no witness list of their own due to their own failure to obey this Court's orders, Defendants called one witness: their director of production, Eric Deutsch ("Deutsch"). Deutsch testified that he was not at GGW during the relevant period (2000 through 2003), but began working at GGW in 2004. Although Deutsch was present when the companies pled guilty to producing approximately 175 titles that featured children that generated almost $160 million in revenue, Deutsch testified he was not aware that the Corporations admitted in their criminal pleas that in 2002 and 2003 that they engaged in a practice of not checking identification, resulting in many minor girls being filmed and sold.

Deutsch testified that GGW supposedly had cleaned up its act after the criminal prosecution—explaining the Pilot software system, which is supposed to catch any underage girls filmed. On cross-examination, Deutsch admitted that Plaintiff B was still in their system

13

with a green light next to her footage.  Deutsch testified like a traffic light, green means go, or the Pilot system showed that her footage was legal and GGW could use it.  For the remainder of their case, Defendants read portions of the Plaintiffs' depositions, in which they testified, like they did before the jury, to the various affects that GGW had on their lives.

### M.    The Court Instructs The Jury That Consent Is Not Relevant

This Court made it very clear that consent is not relevant because this case is about minors.  Any releases that may have been signed were excluded because minors did not have any capacity to consent.  The non-sexually explicit portions of the films of Plaintiffs B were excluded because consent of a minor is irrelevant.  To emphasize this point and make sure the jury understood that consent was not an issue, the Court included in the jury instructions, "[p]urported consent by a minor is ineffective and not an issue in this case." (Plaintiffs' Trial Exh. 4, p. 11).

### N.    Counsel For Francis Invokes the "Slut" Stereotype In Closing

In closing, Francis' counsel pulled out all the stops.  Counsel's argument focused on the lack of causation, Plaintiffs'" personal responsibility" for their sexual exploitation, and finally, counsel invoked the "slut" stereotype, questioning the moral character of the Plaintiffs, and urging the jury to conclude that "these kind of girls" do not deserve a recovery.

The cornerstone of counsel's argument on causation was the absence of any mention of GGW in the medical records.  As to Plaintiff V, counsel argued, "[a]nd when she was hospitalized, she didn't mention Girls Gone Wild, she didn't mention Joe Francis.  She didn't talk about any of it." Exh. 1 at 8.  Regarding Plaintiff B, "[a]nd all of those doctors said that she has bi-polar disorder ... ultimately, the doctors formed the opinion that she was grieving and that she needed to grieve." *Id*. at 11.  For Plaintiff B's mother, "[u]se your common sense.  Why is she not disclosing this to medical professionals?" *Id*. at 12.  Regarding Plaintiff S's prior counseling, "[s]urprise, surprise, she didn't say anything about Girls Gone Wild either, or Joe

14

Francis." *Id.* at 19. As for Plaintiff J, "[s]he didn't tell that doctor that she quit school because of Joe Francis or Girls Gone Wild or because she was teased and bullied. She told you that. But that is not what she told the doctor." *Id.* at 22.

In conclusion, counsel stated,"[i]t is astounding to me that she [Dr. Lebowitz] could simply disregard the conclusions of other trained medicals professionals . . . and regardless of what they had told countless other trained psychologists and doctors, they were wrong." Exh. 1 at 26. The lack of information about GGW in these medical records (not in evidence) was so integral to Francis' attack on causation that after the verdict, Francis' counsel said to the press, "[y]ou can bring PhDs and experts in to extrapolate these opinions, but common sense tells you when they don't talk about it for years, when you had opportunities, and it only comes up when you talk to the plaintiffs' experts, it just doesn't support the causal connection." Exh. 5. These doctors were never before the court and these records were never admitted into evidence or authenticated.

Counsel's next point—"personal responsibility"—was a thinly-veiled attempt to focus the jury on consent, in direct violation of this Court's instruction and law which directs the jury to disregard it. Counsel argued:

> It's the 21st century. The internet was around. These women all certainly knew what a video camera was. It's not like they didn't know the camera was right there. And certainly when something is on film, it's been preserved, someone may see it. That's logical. My two-year-old knows what the video camera is for.
>
> \* \* \*
>
> I'm older than these women. Not by much, but I'm older. As time has progressed, standards have changed. Kids have become more worldly before their time . . . with the cell phones and the texting, and the sexting and all of these other things that we hear about, it's not the way that it was when we were kids.

Exh. 1 at 14, 16. In other words, the law on minors' inability to consent does not apply to these 13, 15, 16, and 17 year old Plaintiffs, because they were supposedly more "worldly" than

counsel or than the jury was at their age.  Despite the law, they should be able to consent and be held responsible for "knowing better."

Counsel concluded her argument on "personal responsibility"—urging the jury to treat these Plaintiffs as if they could consent.  "Imagine your daughter flashing, spring breaking, underage, smoking, drinking.  Now imagine making her a millionaire for it.  That's certainly a lesson in personal responsibility."  Exh. 1 at 29.  Focusing on "personal responsibility," as if the Plaintiffs were adults when the incidents occurred, encouraged the jury to disregard this Court's clear instruction that consent should not be considered.

Finally, despite the many hearings about the danger of sexual stereotyping, counsel invoked the "slut" stereotype and urged the jury to examine the moral character of these girls and determine if they were worthy of a recovery in a classic move to shift the blame from the adult pornographer to the victims.  Counsel argued, "[t]hese are not innocent girls who aren't somewhat familiar with what goes on on spring break ... It is a moral cesspool at spring break in Panama City Beach ... And these girls knew exactly what went on at spring break.  And their parents knew what went on at spring break."  Exh. 1 at 16.  This was no accident, and cannot be misinterpreted.  Counsel reinforced its strategic use of the "slut" stereotype directly following the verdict.  "The jury spoke clearly," Gerard Virga said.  "They vindicated Mr. Francis and they sent a clear message that we don't reward bad behavior."  Exh. 6.

**O.**    **The Jury Verdict**

The jury awarded no damages to any Plaintiff.  On liability, for Counts II, IV, and V, the jury found for Francis.  (Dkt. 613).  For intentional infliction of emotional distress (Count II), the jury found that Francis engaged in "extreme and outrageous conduct," but found Francis, and the other Defendants, did not cause Plaintiffs' damage.  (Dkt. 613).  Under Florida RICO, the jury found Defendants engaged in a pattern of criminal activity in exploiting Plaintiffs B and V, but

16

found this pattern of sexual exploitation caused no damage. (Dkt. 613). The jury awarded no

punitive damages. (Dkt. 613).

**ARGUMENT**

The jury verdict was against the great weight of the evidence and was procured through

the improper *de-facto* admission of the medical records. The verdict is the product of both

substantive and procedural error and, therefore, this Court must grant Plaintiffs a new trial.

A.    **Standard For A Motion For New Trial**

"When ruling on a motion for a new trial, a trial judge must determine if in his opinion,

the verdict is against the clear weight of the evidence or will result in a miscarriage of justice,

even though there may be substantial evidence which would prevent the direction of a verdict."

*Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (citations and punctuation

omitted). "A trial judge may grant a motion for a new trial if he believes the verdict rendered by

the jury to be contrary to the great weight of the evidence. In ruling on a motion for new trial,

the trial judge is permitted to weigh the evidence, but to grant the motion he must find the verdict

contrary to the great, not merely the greater, weight of the evidence." *Watts v. Great Atl. & Pac.

Tea Co.*, 842 F.2d 307, 310 (11th Cir. 1988) (citations omitted); *United States v. Hernandez*, 433

F.3d 1328, 1335 (11th Cir. 2005) ("On a motion for a new trial based on the weight of the

evidence, the court need not view the evidence in the light most favorable to the verdict. It may

weigh the evidence and consider the credibility of the witnesses." (citation and quotations

omitted).[2] "If the court concludes that, despite the abstract sufficiency of the evidence to sustain

the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious

---

[2]    Though *Hernandez* is a criminal case, the standard for granting a new trial is the same in
both civil and criminal cases. *Butcher v. United States*, 368 F.3d 1290, 1297 n.3 (11th
Cir. 2004); *see Johnson v. FFE Transp. Servs., Inc.*, 227 Fed. Appx. 780, 782 (11th Cir.
2007) (civil case citing *Hernandez* for the standard on a motion for new trial).

miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Hernandez*, 433 F.3d at 1335 (citation and quotations omitted).

Where a Rule 59(a) motion is predicated on an evidentiary ruling, the Court must determine whether the ruling was erroneous and, moreover, whether it caused the movant substantial prejudice. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1276 (11th Cir. 2008).

### B.    The Verdict Was Against The Great Weight Of The Evidence

The evidence in favor of the Plaintiffs on this record is overwhelming. The Pleas established that Francis was responsible for creating, producing and selling child pornography of Plaintiff B, and pornographic film featuring images of Plaintiffs J and S as minors flashing. The state conviction established that Plaintiff V was procuring into prostitution as a minor when Francis coerced her to masturbate him. This Court found Francis liable for sexually exploiting Plaintiff B on summary judgment, reserving the question of damages for trial. Dkt. 420 at 14.

The record is saturated with evidence that Francis ran an operation where he, personally and deliberately, recklessly disregarded the high probability of causing harm to minor girls. A number of cameramen testified that Francis enforced the "shoot first ask questions later" policy, a very reckless practice where the age of the girl that was being filmed was not considered until after the footage was created. The cameramen testified that when Francis was questioned about the law, he told the cameramen that it was legal to film underage girls; and the cameramen testified that these underage girls that were filmed, if they were not used in the series, ended up in Francis' personal collection.

Francis admitted in his criminal pleas that he personally selected the footage of Plaintiff B, and knowingly decided to include it in his series even though he had no documentation that

could prove that she and her minor friend were over 18.  Plaintiffs' Trial Exh. 1, p. 7, para. 9(d)-(e).  Francis admitted in his criminal pleas that there were approximately 175 titles, one of which included Plaintiffs J and S, that contained images of minor girls that resulted from his Corporations' practice of not creating documents to establish the girls were over 18.  Attorney Guttman testified that he had to quit after taking an inventory of the GGW series due to ethical concerns.  Francis testified that he did not remember how much he was fined for creating and producing child pornography because he just did not find it significant.  It is hard to imagine a better record of a CEO's and his companies' utter disregard for the high probability of causing Plaintiffs harm than the one before this Court.

The record also contains substantial and uncontroverted evidence that GGW caused Plaintiffs psychological harm.  All four Plaintiffs testified about how GGW had harmed their lives; three of their mothers testified; one of their boyfriends testified.  Plaintiffs put on two experts: an adolescent specialist who explained the scientifically how teenagers, like the Plaintiffs at the time of the incidents, are vulnerable to being preyed upon by a savvy sexual entrepreneur like Francis and his companies, and a psychologist, who did a thorough analysis of the Plaintiffs and found that GGW caused them psychological harm.

Defendants did not put on a single witness or any other evidence to challenge the fact that GGW caused the Plaintiffs harm.  Instead, Defendants on cross-examination pointed to records of phantom physicians, who were not before the Court, and whose records did not go into evidence, and made these "challenges" to the Plaintiffs' expert, Dr. Lebowitz, the cornerstone of their defense.  The jury never read these records—the defense never met this Court's deadlines to try to get them into evidence.  The jury never heard from any of these physicians—the defense did not call them.  Further, Dr. Lebowitz explained that in her professional opinion it was utterly

unremarkable that GGW did not appear in the medical records—often people do not talk about shame based injuries, like rape and child molestation.  Exh. 2 at 103.  No one rebutted Dr. Lebowitz' opinion that it was unremarkable that GGW did not appear in the medical records.

Defense counsel's paraphrase of certain portions of the medical records, which are not in evidence, via cross-examination does not outweigh the testimony of all of the Plaintiffs' fact witnesses and two experts.  In a case like this, a new trial is appropriate.  *Bazile v. Bisso Marine Co.*, 606 F.2d 101, 105 (5th Cir. 1979) (affirming grant of new trial where "[t]he only witness who supported plaintiff's story was the plaintiff" and "the trial judge could have placed great weight on the witnesses presented by defendant"); *see Johnson*, 227 Fed. Appx. at 782 (affirming grant of new trial because jury could not possibly have concluded that plaintiff was not comparatively negligent); *Ins. Co. of N. Am. v. Valente*, 933 F.2d 921, 925 (11th Cir. 1991) (reversing trial court's denial of a motion for new trial based upon the weight of the evidence where "[t]here was no real evidence presented to refute" the plaintiff's central contention and "there was no antithetic evidence to contradict the [plaintiff's] experts' testimony"); *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1516 (11th Cir. 1989) (affirming grant of a new trial where the damages awarded were clearly against the gravamen of the evidence presented); *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 521 (11th Cir. 1988) ("Given this large amount of uncontradicted evidence, the district court, in exercising its prerogative to reweigh the evidence in considering a motion for new trial, properly determined that the jury's verdict was against the great weight of the evidence.").

This jury verdict is against the great weight of the evidence and is a miscarriage of justice.  Therefore, this Court should grant Plaintiffs a new trial.

**C.    Defense Counsel Substantially Prejudiced the Plaintiffs By Improperly Putting Plaintiffs' Medical Records Before The Jury**

Plaintiffs' medical records were not included on Defendants' pre-trial exhibit list, nor did Defendants attempt to authenticate those documents at trial.  "[A]uthentication under Rule 901 requires the presentation of sufficient evidence to make out a prima facie case the proffered evidence is what it purports to be[.]"  *United States v. Duncan*, 166 Fed. Appx. 464, 466 (11th Cir. 2006).  "Authentication is a 'condition precedent to admissibility.'"  *Snover v. City of Starke*, 398 Fed. Appx. 445, 449 (11th Cir. 2010) (quoting Fed. R. Evid. 901(a)).  Absent authentication, therefore, the medical records were inadmissible.[3]  *Id.* (declining to consider unauthenticated document).  Defendants should not have been able to put anything contained in the medical records into evidence.

Notwithstanding their inadmissibility, counsel for Defendants repeatedly and improperly read their substance into evidence under the guise of the cross-examination of Dr. Lebowitz.  Indeed, counsel read other medical professionals thoughts and diagnoses to the jury, *see* Exh. 2 at 96-99, 101-110 (Plaintiff B); *id.* at 112-116 (Plaintiff V); *id.* at 117-122, 125-127, 129, 132-33 (Plaintiff J), *id.* at 143 (Plaintiff S), a tactic to which Plaintiffs repeatedly objected because those materials were not and could not be introduced into evidence.  *Id.* at 122-124, 130-132, 141-143.

"It is improper under the guise of artful cross-examination, to tell the jury the substance of inadmissible evidence."  *United States v. Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999) (citation and quotations omitted).  Indeed, "[p]rotections against the use of privileged and inadmissible evidence would be of little benefit if" parties could "simply identif[y] the [inadmissible material] in front of the jury, and then read it in open court under the guise of

---

[3]    Rule of Evidence 902 allows certain categories of documents to be self-authenticating, *i.e.*, authenticated without "[e]xtrinsic evidence of authenticity[.]"  The records in question are not self-authenticating.

impeachment." *United States v. Hall*, 989 F.2d 711, 716 (4th Cir. 1993).  In reading and paraphrasing the thoughts, impressions, and diagnoses of medical professionals that were not in the courtroom, counsel introduced the records as substantive evidence without establishing that they were what they purported to be.

Though the authentication requirement may seem overly formalistic, it must be followed. Basically, without authentication, there is no reliable indicator that these medical records fully and accurately reflect what Plaintiffs reported to the medical professionals. This is critical here, because counsel pit the credibility of the absent and unknown author of the records against Dr. Lebowitz. Exh. 2 at 146-148. Without confirmation of the reliability of the inference that these records were in fact full accounts of the information provided to the authors of the records, they were irrelevant. *See* Fed. R. Evid. 901, advisory committee note ("This requirement of showing authenticity or identity fails in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b).").

Moreover, the admission of the substance of the medical records was very prejudicial to Plaintiffs. Defendants' causation case relied exclusively on cross-examination of Dr. Lebowitz. Defendants were able to set up a competing expert opinion to challenge that of Dr. Lebowitz by repeatedly referencing the opinions and the notes of other doctors in the unauthenticated medical record. Defendants hammered home with Dr. Lebowitz that the medical records did not say anything about GGW. As detailed above, as if the records were actually in evidence, the Defendants made the fact that the Plaintiffs had supposedly not disclosed GGW to these medical professionals the cornerstone of her argument, relying on this "evidence" to prove the Plaintiffs recent fabricated their claims to cash in on a "lottery ticket." Exh. 1 at 8-9, 12-13, 19, 22, 26-27; Exh. 3, April 6, 2011 T.Tr. at 5, 11 ("When they saw dollar signs, they saw trauma"). Counsel

further relied on the supposed diagnoses of these other medical experts as a counterpoint to

Dr. Lebowitz' analysis, like Plaintiff B's bipolar disease as the "real" cause of her psychological

issues, and the information contained in the medical records the "real" reasons for Plaintiff J's

suicide attempts.  Exh. 1 at 10-13, 20-23.

Finally, counsel castigated Plaintiffs' expert for ignoring details supposedly contained in

the unauthenticated and not admitted medical records. Exh. 1 at 26-27 ("She could tell you with

a reasonable degree of medical certainty that the problems and obstacles encountered by these

plaintiffs was due to the conduct of Francis. And that regardless of what they had told countless

other trained psychologists and doctors, they were wrong.  They didn't have the whole picture.").

Defendants' closing was devoted to argument directly flowing out of the improperly admitted

medical records; that Defendants believed this to be their best—indeed, only—argument against

causation demonstrates how prejudicial the *defacto* admission of those unauthenticated medical

records was.

### D.    Francis' Behavior Prejudiced Plaintiffs, Requiring A New Trial

Francis' behavior during the trial requires that this Court grant Plaintiffs a new trial.  As

detailed above, Francis decided to proceed *pro se* for a large portion of the trial, even though he

can afford counsel (and lied to the jury as to the reason).  While *pro se*, Francis did everything in

his power to disrupt the proceedings—he spoke out of turn, he testified to jury without bothering

to place himself under oath or expose himself to cross-examination, and tried as hard as he could

to be as disruptive and prejudicial as possible.

These conditions made a fair trial and impartial jury—*i.e.*, one considering only the

evidence before it—virtually impossible; Plaintiffs had the right to both.  *See J.E.B. v. Ala. ex*

*rel. T.B.*, 511 U.S. 127, 145 n.19 (1994) ("The American tradition of trial by jury, considered in

connection with either criminal or civil proceedings, necessarily contemplates an impartial

jury[.]" (citation omitted)); *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.").

The Supreme Court has long warned that trials taking place in a circus-like atmosphere are to be guarded against, as "the very purpose of a court system [is] to adjudicate controversies, **both criminal and civil**, in the calmness and solemnity of the courtroom according to legal procedures. Among these legal procedures is the requirement that the jury's verdict be based on evidence received in open court[.]" *Sheppard v. Maxwell*, 384 U.S. 333, 350-51 (1966) (citations and punctuation omitted and emphasis added); *see Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1053 (1991) (noting that *Sheppard* dealt with "a trial that can only be described as a circus"). That it was Francis, the litigant in whose favor judgment was rendered whom was totally responsible for that atmosphere is all the more cause for a grant of a new trial.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court grant them a new trial as to Francis.

s/Rachael G. Pontikes
Larry Selander
Thomas G. Dent
Rachael G. Pontikes
Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, IL 60606
(312) 499-6700
Fax: (312) 499-6701

and

D. Ross McCloy, Jr.
Robert A. Fleming
Harrison, Sale, McCloy,
   Duncan & Jackson, Chtd.
Florida Bar No. 0262943
Post Office Drawer 1579
Panama City, FL 32402
(850) 769-3434
Fax:  (850) 769-6121

ATTORNEYS FOR PLAINTIFFS

DM1\2626709.2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 9, 2011, she caused the foregoing document to be electronically filed with the Clerk of the Court, using the Court's CM/ECF system, which will send electronic notification of the filing to the below CM/ECF participant.  Parties may access this filing through the Court's system.

Rachel and Gerard Virga
Virga Law Offices
231 East 4th Street
Panama City, FL  32401
rachelvirga@gmail.com


/s/Rachael G. Pontikes